***NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| LEONARDO VILLEGAS, | |
| Petitioner, | Civil Action No. 15-3420 (SDW) |
| v. | **OPINION** |
| STEPHEN D'ILIO, et al., | |
| Respondents. | |

**WIGENTON**, District Judge:

Presently before the Court is the petition for a writ of habeas corpus of Leonardo Villegas ("Petitioner") brought pursuant to 28 U.S.C. § 2254 challenging his state court conviction (ECF No. 3), to which Respondents have responded (ECF No. 7).  For the following reasons, this Court denies the petition and no certificate of appealability shall issue.

## I.  BACKGROUND

In its opinion affirming Petitioner's conviction, the New Jersey Superior Court – Appellate Division provided the following summary of the facts evinced at Petitioner's trial:

> Jorge "Georgie" Gonzalez allegedly owed [Petitioner] money. On September 30, 2003, Gonzalez was driving a rental car in Paterson, when he passed William "Willie" Morales standing in front of 59 Summer Street. Morales was a homeless, regular drug user who loitered in the hallway of Gonzalez's apartment building. Gonzalez asked Morales to go for a ride and Morales agreed. The pair drove through town, then drove back to Summer Street, where they parked and smoked crack cocaine at approximately 2:30 p.m. Morales testified at trial that he did not see a gun in Gonzalez's possession that day.

At approximately 2:30 p.m., Marilyn Torres (Marilyn) saw Gonzalez and Morales sitting in the car. A male teenager approached Marilyn and said he was looking for "Georgie [Gonzalez][.]" After Marilyn pointed out Gonzalez, the young man walked into "Unlimited Kuts Barbershop" and approached [Petitioner], who was getting his weekly haircut from his regular barber, Franklin "Frankie" Torres (Frankie). The young man told [Petitioner] that Gonzalez was outside, and asked, "What do you want me to do, get [Gonzalez] out of the car and beat him up?" [Petitioner] replied, "I'll take care of that." When Frankie asked [Petitioner] if there was a problem, [Petitioner] replied that he was "going to hit somebody." [Petitioner] then left the barbershop, mid-haircut, with the young man following. Outside, the young man pointed out Gonzalez. When the young man asked if [Petitioner] was going to hurt Gonzalez, [Petitioner] replied, "I'll take care of it." [Petitioner] walked to his car, retrieved and put on a "hoody" sweatshirt and a latex glove, and approached the passenger side of Gonzalez's car. Gonzalez was sitting in the driver's seat and Morales was in the passenger's seat.

[Petitioner] asked Gonzalez for the money he owed him, but Gonzalez said he did not have the money and would pay defendant later. After [Petitioner] twice more demanded the money, Gonzalez said, "So what [are] you [going to] do?" and "What do you want me to do, to get my gun?"[1]   [Petitioner] pulled out a handgun and fired multiple shots across Morales, striking Gonzalez at least five times, killing him.  [Petitioner] then went back to the barbershop, held Frankie at gunpoint, and demanded re-entry.  Frankie complied.  [Petitioner] then insisted that Frankie finish his haircut, but Frankie refused.  [Petitioner] then exited the barbershop through the back door.

After the shooting, Morales hid in a nearby park until police found him and took him to headquarters.  The next day, Morales gave a written statement, and after reviewing six photographs, identified a photograph of [Petitioner] as the shooter, stating, "[T]his really looks like the guy but I'm not sure [.]"  Marilyn gave a sworn statement to police the day after the shooting, and reviewed a photo array that included a photograph of [Petitioner]. Marilyn identified [Petitioner]'s photograph and signed it.  However, at trial, Marilyn

---

[1] The Appellate Division also noted that medical examiners found a knife on the victim's person, but did not find any evidence that the victim had possessed a gun.  (Document 4 attached to ECF No. 7 at 5).

2

testified that she had never seen [Petitioner] before and did not see the shooter in the courtroom. When asked if [Petitioner] looked similar to the shooter, Marilyn testified that he "look[ed] a little like" the person she identified, but was "fat[ter]."

Duhamel Santiago was in the area when the shooting occurred. He called his friend Luis "Sonic" Arriaza to find out what happened, and arranged to meet in a van outside Arriaza's home. Arriaza, Santiago, [Petitioner] (whom Santiago had known for approximately five to seven months by the name "Bori"), and a fourth man met in the van. Santiago described [Petitioner] as "hyper and scared," and he had "half a haircut" and a gun in his hand. Santiago asked [Petitioner] "[W]hat happened?" [Petitioner] explained that he had given Gonzalez three to four hundred dollars to purchase a gun, but Gonzalez did not do so and "disappeared." [Petitioner] also said that while he was getting his haircut, he learned Gonzalez was sitting in a nearby car, he went outside and argued with Gonzalez, and then "whatever happened, happened." [Petitioner] also expressed frustration with Frankie, and suggested he would "take care of him[ .]" Arriaza took the gun from [Petitioner]'s lap and suggested [Petitioner] turn himself in. After his arrest on an unrelated bench warrant, Santiago provided this information to police and identified [Petitioner]'s photograph.

Police interviewed Frankie on the evening of the shooting and again approximately one year later. Frankie provided two formal statements, identified and signed [Petitioner]'s photograph, and told the police he knew [Petitioner] for approximately four years and cut his hair every week. At trial, Frankie identified [Petitioner] as the man who left the barbershop and as the shooter.

Police also interviewed Jose Lugo, the barbershop owner who worked at the chair next to Frankie. Lugo told police that he was cutting hair at the time of the shooting and Frankie's customer left the chair and barbershop just before the event. Lugo also corroborated the details about how [Petitioner] used the barbershop's rear door to escape following the shooting.

[Petitioner] testified and admitted being in the barbershop getting a haircut at 2:30 p.m. on the day of the shooting. He denied knowing or shooting Gonzalez, knowing Santiago, making inculpatory statements to Santiago, or that the van meeting ever occurred. [Petitioner] also testified that before his haircut he had arranged to purchase marijuana. During the haircut, a friend told

3

>him that the person with his marijuana was waiting half a block away, and he walked to the area, but the marijuana never arrived. [Petitioner] claims he stayed in the area for two to three hours then returned to his aunt's house, where he resided. After learning that night that the police were searching for him, defendant decided to surrender. He was arrested on October 1, 2003, after surrendering himself to the Passaic County Prosecutor's Office, accompanied by his attorney.
>
>At trial, [Petitioner] relied primarily on an identification defense, and testified he did not know or shoot Gonzalez.

(Document 4 attached to ECF No. 7 at 4-8).

At the conclusion of Petitioner's case in chief, Petitioner's counsel elected not to call Luis Arriaza, Petitioner's co-defendant who had been severed from Petitioner's case so that he might be available as a witness, to testify on Petitioner's behalf despite the fact that Arriaza would purportedly have provided exculpatory testimony. (Document 32 attached to ECF No. 7 at 3). The trial judge, foreseeing the challenge that Petitioner raises regarding that decision in his current habeas petition, therefore engaged defense counsel and Petitioner in the following colloquy out of the presence of the jury:

>THE COURT:  Okay.  [Defense Counsel].
>
>[Defense Counsel]:  We're ready to proceed with summations.
>
>THE COURT:  Okay.  The defense is going to rest?
>
>[Defense Counsel]:  Yes.
>
>THE COURT:  All right.  Then I need to make a record about, obviously, you're not going to call the [severed] co-defendant Mr. Arriaza, correct?
>
>[Defense Counsel]:  That is correct.

4

THE COURT: All right. Now just so the record of today reflects it. It's well reflected in the record in this case, this case involved the co-defendant, [Petitioner], and the co-defendant Luis Arriaza, and there was a motion for a severance at the beginning of the case and I heard the testimony of Mr. Arriaza in chambers in the presence of his attorney without the presence of the prosecutor or the defense counsel and Mr. Arriaza was in a position to say that [Petitioner] was not present at or to say that he, Mr. Arriaza, was not present at a meeting that Duhamel Santiago testified to very soon after the killing where things were discussed about the killing and admissions made by [Petitioner] about the killing.

According to Mr. Santiago, Mr. Arriaza was present at the meeting and was the person who directed him, Mr. Santiago, to this meeting. And I know after the severance motion [Defense Counsel] met with Mr. Arriaza at the county jail, on a Sunday for one thing and I believe has met with him again at the Passaic County Jail and, apparently, the defense position is that he's not going to be called and I assume you've discussed this witness with [Petitioner] is that right, [Defense Counsel]?

[Defense Counsel]: Correct.

THE COURT: [Do y]ou want to say anything for the record as to why [Petitioner] is not calling the co-defendant who [Petitioner] wanted to be his witness and was the reason this case was severed when we started the trial?

[Defense Counsel]: I will merely say the following: we were given the opportunity by the court to call Mr. Arriaza. The court has made him available to us through the Sheriff's Department. I've interviewed Mr. Arriaza. I'm aware that he gave exculpatory testimony in chambers, the exact nature of which I don't know but I will assume it was exculpatory [information] which is consistent with my information. However, I've discussed the matter and all facets of it with my client concerning if he is called or there are additional issues that surfaced regarding a cell phone, cell phone records. I've looked into everything. Spoke to my client at length about it. And for the reasons that my client and I have discussed we have both decided, that is, I decided as a trial strategy and [Petitioner] agreed with me not to call Mr. Arriaza as a witness in this case.

5

And I know hindsight is always 20/20 but I get paid to make decisions and judgments and that's what I did.   Although in this case [Petitioner] agrees with me as well.

THE COURT:   [Do y]ou want to ask [Petitioner] about that for the record[?]

[Defense Counsel]:   [Petitioner,] you and I discussed whether or not we should call Arriaza as a witness, correct?

[Petitioner]:   Yes.

[Defense Counsel]:   Did you, ultimately, agree that even though you have a right to call him as a witness you've agreed with my judgment not to call him as a witness is that correct or not correct?

[Petitioner]:   It's correct.

THE COURT:   Okay.   You understand, [Petitioner], that Mr. Arriaza would say he was never at a meeting with Mr. Santiago and you and Shalik?

[Petitioner]:   Yes.

THE COURT:   And furthermore, in the midst of this trial, your attorney was given a tape recording of a woman calling Nextel, a phone company and according to the phone company they tell her that the telephone number they provide was in fact out of service from September 28, 2003 to I believe October 2nd or 3rd of 2003 when the bill for that phone was paid and then it was turned on.   So that phone was out of service on September the 30th, 2003, according to this tape recording.

Now I don't know who this lady is or what this phone . . . is.   But I gather that there is evidence to show that this is a phone that Mr. Arriaza had on September 30th and since the phone was out of order Mr. Santiago could not have called Mr. Arriaza at least on that phone.

Now, I know your attorney has very carefully gone over this evidence and whatever it is that could be put together from the Nextel records and from this lady and from Mr. Arriaza, and none of that is being pursued now.   Do you understand that?

6

[Petitioner]: Now I'm understanding. I didn't really understand but now I do.

THE COURT: And I don't know all that your attorney has said to you about this area of the evidence, and how it might be helpful and how it might not be helpful or even harmful, but [Defense Counsel's] choice is not to put any of this evidence into your case in your defense in an effort to contradict Mr. Santiago.

Now I know this is much more with regard to Mr. Santiago, with regard to Mr. Arriaza and the telephone, Mr. Arriaza has a separate case pending of attempted murder and in that case there are tape recordings supposedly of Mr. Arriaza saying that he wants a certain person killed. He's charged with attempted murder. So he is, obviously, on the telephone based on the evidence in that other case. And that phone is not a phone that is listed to him. So there is the other evidence that he did have a phone at, I know approximately a year later, if I remember correctly, that was not his phone but that clearly is [his] voice on the tape and the State says he is, he was using another phone that was not registered to him on that occasion.

How that would play into this I don't know. I wouldn't venture to say. But I know that [Defense Counsel] has discussed this with you at great length, in fact, met with you over the weekend based on what you were saying last week if you did have that meeting; is that correct?

[Petitioner]: True.

THE COURT: Are you in agreement with that decision as well not to go ahead with presenting any evidence dealing with this business of the telephone records?

[Petitioner]: No problem.

THE COURT: That means you do agree with [Defense Counsel]'s advice?

[Petitioner]: Yes.

THE COURT: Do you have any question about any part of this? Don't be afraid to ask if you do.

7

>   [Petitioner]:   No.
>
>   THE COURT:   All right.   Thank you[, Petitioner].

(Document 32 attached to ECF No. 7 at 3-8).

Petitioner's trial counsel was also provided an opportunity to place on the record his strategic reasons for not calling Mr. Arriaza out of the presence of the State or the jury:

>   [Defense Counsel:]   At the direction of the Court, I'm placing upon the record my reasons for not calling Luis Arriaza [as] a witness in this case, although he does possess what could be considered exculpatory information [i]n that he contradicts the State's witness Duhamel Santiago.
>
>   The reasons that I'm not calling him are several.   The ones that were already put on the record and it's a matter of record, so I don't have to go into them but that which concerned me the most, and my client agreed with me, I discussed this with my client not to call Mr. Santiago and that is on the record already.   But I've checked out the . . . phone number that Mr. Arriaza gave to us. And although the phone number does check out, it comes back to some girl and he says that was his phone, he used it.   It's still not in his name[, s]o it gets a little tenuous.
>
>   In addition to that, I have information that he had access to other cell phones, so that's going to make it a little difficult [to argue that Santiago couldn't have called Arriaza].   Although he does deny that this alleged meeting [ever] took place and it would help in that regard, I wouldn't be able to corroborate it, I don't believe it, with cell phone records.
>
>   In addition to that, and perhaps the biggest reason, I had the opportunity to learn that another person present at the meeting was a guy by the name of Shalik.[2]   Shalik's name surfaced during the trial as being, I think it was . . . Thomas Murphy came out for the first time during the trial.   And I then found out that Thomas Murphy is, in fact, a live person and his attorney is Kalman Geist.

---

[2] The transcripts alternatively spell this name as "Shalik" and "Shaleek" which presumably have the same phoenetic pronunciation.   For the sake of consistency, "Shalik" is used throughout this opinion.

8

>And I know that Kalman Geist had some preliminary discussions with the State to call Mr. Murphy as a witness, that's the same person, Shalik.
>
>The State didn't make him any offers. They weren't going to call him because it all surfaced at the last minute and the State didn't think it was fair to call a witness at this point. However, I was concerned if I called Arriaza it would lengthen the trial. The State would have an opportunity to adjourn it for a few days, maybe they would rediscuss the matter with Mr. Geist and perhaps this Murphy would be called as a rebuttal witness to Mr. Arriaza. And my information is, from Mr. Geist, . . . that Thomas Murphy, he would corroborate Santiago['s testimony] and that I did not want to occur. I didn't want to have two witnesses.
>
>Now, they may never have called him but I couldn't take that chance and that's my biggest concern I had, is that this guy Murphy may surface and testify, now I['ve] got two people to deal with, which would make it a lot more difficult. And I discussed it with my client but I didn't want the State to know that I learned that Murphy would hurt us at the time of trial. I never interviewed Murphy. But based upon what his lawyer said and he was ready to make a deal with him if they would give him what he wanted but they just couldn't get together on the term of years or time or whatever.
>
>Other than [that] I felt, after analyzing this case, a jury in this case is not going to convict [Petitioner solely] on the testimony of Santiago. I think we neutralized him, so he's not that important in the total scheme of things, even though he does give inculpatory information. And I didn't want to make this a big issue and then come out on the short end of it.
>
>I believe that the jury, if they convict, it will be because they believe Franklin Torres and not because of . . . Santiago.
>
>So that's basically my reasoning. And the record will reflect that the only ones present are myself and the reporter.

(Document 39 attached to ECF No. 7 at 2-4).

The jury ultimately convicted Petitioner of first degree murder in violation of N.J. Stat. Ann. §§ 2C:11-3(a)(1) or (a)(2), second degree possession of a weapon for an unlawful purpose

9

in violation of N.J. Stat. Ann. § 2C:39-4, and third degree unlawful possession of a weapon in violation of N.J. Stat. Ann. § 2C:39-5(b).  (Document 4 attached to ECF No. 7 at 2).  Following trial, Petitioner also pled guilty to possession of marijuana with intent to distribute within 1000 feet of a school in violation of N.J. Stat. Ann. §§ 2C:35-7 and 35-5(a).  (*Id.*).  At sentencing, the possession for an unlawful purpose charge was merged into the murder charge, and Petitioner received a sixty five year term of imprisonment on those counts subject to an eighty-five percent parole disqualifier, a consecutive five year sentence on the unlawful possession charge, and a concurrent three year sentence on the drug charge.  (*Id.* at 2).  Petitioner appealed, and the New Jersey Appellate Division affirmed, rejecting, *inter alia*, Petitioner's argument that he was prejudiced by Duhamel Santiago's testifying while wearing prison garb.  (*Id.* at 1-17).  The New Jersey Supreme Court denied certification in March of 2009.  *State v. Villegas*, 198 N.J. 474 (2009).

Petitioner then filed a petition for post-conviction relief ("PCR") in which he raised the ineffective assistance of counsel claims he presents in his current habeas petition.   The trial court denied that PCR petition on March 16, 2012.  (Document 6 attached to ECF No. 7). Petitioner appealed, and the Appellate Division affirmed in October 2014.  (Document 7 attached to ECF No. 7).  The New Jersey Supreme Court denied certification as to Petitioner's PCR petition in January 2015.  *State v. Villegas*, 220 N.J. 269 (2015).  Petitioner thereafter filed the instant habeas petition in which he again argues that Duhamel's testimony in prison garb denied him a fair trial, and that counsel was ineffective in so much as counsel failed to call Arriaza as a witness and failed to provide a Spanish language interpreter at pretrial meetings. (ECF No. 3).

10

## II. DISCUSSION

### A. Legal Standard

Under 28 U.S.C. § 2254(a), the district court "shall entertain an application for a writ of habeas corpus [o]n behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." A habeas petitioner has the burden of establishing his entitlement to relief for each claim presented in his petition based upon the record that was before the state court. *See Eley v. Erickson*, 712 F.3d 837, 846 (3d Cir. 2013); *see also Parker v. Matthews*, --- U.S. ---, ---,132 S. Ct. 2148, 2151 (2012). Under the statute, as amended by the Anti-Terrorism and Effective Death Penalty Act, 28 U.S.C. § 2244 ("AEDPA"), district courts are required to give great deference to the determinations of the state trial and appellate courts. *See Renico v. Lett*, 559 U.S. 766, 772-73 (2010).

Where a claim has been adjudicated on the merits by the state courts, the district court shall not grant an application for a writ of habeas corpus unless the state court adjudication

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2). Federal law is clearly established for these purposes where it is clearly expressed in "only the holdings, as opposed to the dicta" of the opinions of the United States Supreme Court. *See Woods v. Donald*, --- U.S. ---, ---, 125 S. Ct. 1372, 1376 (2015). "When reviewing state criminal convictions on collateral review, federal judges are required to

11

afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong." *Id.* Where a petitioner challenges an allegedly erroneous factual determination of the state courts, "a determination of a factual issue made by a State court shall be presumed to be correct [and the] applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

**B. Analysis**

**1. Petitioner's Prison Garb Claim**

Petitioner argues that the trial court in this matter erred when it permitted a prosecution witness, Duhamel Santiago, to testify while wearing prison garb. In *Estelle v. Williams*, 425 U.S. 501, 504-05 (1976), the Supreme Court held that the compelling of a criminal defendant to wear prison garb during his trial had a negative effect on a Petitioner's right to receive a fair trial as the prison attire could undermine the presumption of innocence in the eyes of the jury, and thus such a compulsion was inconsistent with Due Process. The chief purpose of preventing compelled wearing of prison garb by criminal defendants was to protect a defendant's presumption of innocence, *see Estelle*, 425 U.S. at 503-05; *see also Deck v. Missouri*, 544 U.S. 622, 630 (2005). The presumption of innocence, however, does not apply to the non-defendant witnesses at a criminal trial. *See Green v. Warren*, No. 12-6148, 2013 WL 6865420, at *14 (D.N.J. Dec. 20, 2013). The Supreme Court has therefore never extended the *Estelle* rule regarding prison garb to non-defendant witnesses. *Id.*

Even if the *Estelle* rule did apply to witnesses, the appearance of a prosecution witness in prison garb was ultimately harmless to Petitioner as any prejudice resulting from the jury's

12

negative reaction to the witness's status would have harmed the prosecution's case, and not Petitioner's. Indeed, because Santiago ultimately testified that he was a convicted prisoner, no prejudice could have resulted from his testifying in prison garb because his criminal history was placed before the jury by his own testimony. *See Green*, 2013 WL 6865420 at \*14; *see also Stahl v. Henderson*, 472 F.2d 556, 557 (5th Cir. 1973) ("[n]o prejudice can result from seeing that which is already known); *United States v. Brooks*, 125 F.3d 484, 499 (7th Cir. 1997) (where even a defense witness testifies that she is a convicted prisoner, any possible prejudice from the wearing of prison attire is dispelled by that admission). Thus, even if Petitioner were correct that the *Estelle* rule did apply to the State's own witnesses, his claim would still fail because he was not prejudiced by Santiago's testifying while wearing prison garb because the wearing of that garb did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). As such, Petitioner's prison garb claim is without merit, and the New Jersey Court's decision denying that claim was neither an unreasonable application of applicable law or facts. Petitioner is therefore not entitled to habeas relief on this claim.

**2. Petitioner's ineffective assistance of counsel claims**

Petitioner's remaining two claims both assert that he received ineffective assistance of counsel prior to and during his criminal trial.[3] The standard which governs such claims is well

---

[3] Although he presents them as two distinct claims, Petitioner's grounds one and two both assert that Petitioner's trial counsel was constitutionally ineffective in failing to call Petitioner's co-defendant, Luis Arriaza, as a witness at trial, and thereby deprived Petitioner of his defense at trial. This Court therefore treats those two grounds as a single claim of ineffective assistance of counsel. Thus Petitioner has presented only two ineffective assistance claims: one asserting

13

established:

> [c]laims of ineffective assistance are governed by the two-prong test set forth in the Supreme Court's opinion in *Strickland v. Washington*, 466 U.S. 668 (1984). To make out such a claim under *Strickland*, a petitioner must first show that "counsel's performance was deficient. This requires [the petitioner to show] that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* at 687*; see also United States v. Shedrick*, 493 F.3d 292, 299 (3d Cir. 2007). To succeed on an ineffective assistance claim, a petitioner must also show that counsel's allegedly deficient performance prejudiced his defense such that the petitioner was "deprive[d] of a fair trial . . . whose result is reliable." *Strickland*, 466 U.S. at 687; *Shedrick*, 493 F.3d at 299.
>
> In evaluating whether counsel was deficient, the "proper standard for attorney performance is that of 'reasonably effective assistance.'" *Jacobs v. Horn*, 395 F.3d 92, 102 (3d Cir. 2005). A petitioner asserting ineffective assistance must therefore show that counsel's representation "fell below an objective standard of reasonableness" under the circumstances. *Id.* The reasonableness of counsel's representation must be determined based on the particular facts of a petitioner's case, viewed as of the time of the challenged conduct of counsel. *Id.* In scrutinizing counsel's performance, courts "must be highly deferential . . . a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.
>
> Even where a petitioner is able to show that counsel's representation was deficient, he must still affirmatively demonstrate that counsel's deficient performance prejudiced the petitioner's defense. *Id.* at 692-93. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. The petitioner must demonstrate that "there is a reasonable probability, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694; *see also Shedrick*, 493 F.3d at 299. Where a "petition contains no factual matter regarding

---

counsel failed to call Arriaza, and one asserting that counsel was ineffective for failing to provide an interpreter during pre-trial meetings. (*See* ECF No. 3 at 20-29).

> *Strickland's* prejudice prong, and [only provides] . . . unadorned legal conclusion[s] . . . without supporting factual allegations," that petition is insufficient to warrant an evidentiary hearing, and the petitioner has not shown his entitlement to habeas relief. *See Palmer v. Hendricks*, 592 F.3d 386, 395 (3d Cir. 2010). "Because failure to satisfy either prong defeats an ineffective assistance claim, and because it is preferable to avoid passing judgment on counsel's performance when possible, [*Strickland*, 466 U.S. at 697-98]," courts should address the prejudice prong first where it is dispositive of a petitioner's claims. *United States v. Cross*, 308 F.3d 308, 315 (3d Cir. 2002).

*Judge v. United States*, --- F. Supp. 3d ---, ---, 2015 WL 4742380, at *3-4 (D.N.J. 2015).

Petitioner first argues that counsel was ineffective in failing to call his severed co-defendant, Luis Arriaza, as a witness at trial. Where a petitioner challenges counsel's decisions as to which witnesses to call at trial, courts "are 'required not simply to give [the] attorney[] the benefit of the doubt, but to affirmatively entertain the range of possible reasons [petitioner's] counsel may have had for proceeding as he did.'" *Branch v. Sweeney*, 758 F.3d 226, 235 (3d Cir. 2014) (quoting *Cullen v. Pinholster*, 563 U.S. 170, 196 (2011)). "*Strickland* requires that a defendant 'overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.' 466 U.S. at 689 (internal quotation marks omitted). If the Government 'can show that counsel actually pursued an *informed* strategy (one decided upon after a thorough investigation of the relevant law and facts),' the effectiveness of counsel's assistance is 'virtually unchallengable.' *Thomas v. Varner*, 428 F.3d 491, 500 (3d Cir. 2005)." *United States v. Graves*, 613 F. App'x 157, 159 (3d Cir. 2015).

Here, it is abundantly clear that counsel's decision not to call Luis Arriaza was a matter of informed trial strategy and not deficient performance. Presciently foreseeing the challenge Petitioner now brings, the trial judge specifically asked counsel to place his reasons for failing to

15

call Arriaza on the record, and counsel did so. (Document 32 attached to ECF No. 7; Document 39 attached to ECF No. 7). Counsel specifically stated in camera and on the record that his decision not to call Arriaza was based on his perception that telephone records failed to corroborate Arriaza's testimony, that Arriaza's testimony could only challenge the testimony of one of the state's lesser witnesses (Duhamel Santiago) and could do nothing to challenge much of the eye witness testimony, and that calling Arriaza would permit the State to call a rebuttal witness – Thomas Murphy, also known as Shalik. (Document 39 attached to ECF No. 7 at 2-3, Document 32 attached to ECF No. 7 at 4-13). Murphy, counsel suggested, would have contradicted the testimony of Arriaza and buttressed the testimony of Santiago, thus defeating the entire purpose of calling Arriaza. (Document 39 attached to ECF No. 7 at 2-3). Given counsel's perception that he had neutralized the testimony of Santiago on cross examination, counsel believed that calling Arriaza was simply not worth the risk it entailed given the telephone records and the possibility of the calling of Thomas Murphy as a rebuttal witness. (*Id.* at 4). Indeed, when he was asked during trial whether he understood counsel's reasons for not calling Arriaza, Petitioner not only stated that he understood those reasons, but also that he agreed with the decision not to call the witness. (Document 32 attached to ECF No. 7 at 5-8). It is thus clear from the record that counsel's decision not to call Arriaza was a matter of informed trial strategy, strategy with which Petitioner ultimately agreed at trial. As such, that decision is "virtually unchallengable" and Petitioner has failed to show that counsel was deficient in failing to call Arriaza. *Thomas*, 428 F.3d at 500. As Petitioner's claim is without merit, it is clear that the decision of the New Jersey Courts to deny Petitioner relief on this claim was neither an unreasonable application of federal law nor the facts of Petitioner's case, and Petitioner is thus not entitled to habeas relief.

16

In his final claim, Petitioner asserts that trial counsel was ineffective in failing to provide him with a Spanish interpreter during pre-trial meetings. As Petitioner was provided with a translator at trial, Petitioner does not contend that he could not understand the in-court proceedings, but only that he could not fully understand counsel during meetings outside of trial and that as a result he was not adequately prepared to testify in court and was unable to fully articulate his view of the facts to counsel. Petitioner is, at best, vague about how he was prejudiced by this allegation of deficient performance, as he asserts only that he felt unprepared to testify and was less credible on the stand as a result. Petitioner likewise fails to argue what additional information beyond that counsel made use of at trial he could have contributed had he and counsel been better able to understand one another. Given the vague allegations as to *Strickland's* second prong, it is difficult to discern how exactly Petitioner was prejudiced by the alleged difficulties he had communicating with counsel.

Putting prejudice aside for the moment, Petitioner's own assertions and statements he made at trial clearly undercut his argument. Petitioner admits in his petition, as he did before the PCR court, that counsel encouraged him to bring friends and family to their meetings at trial, and that Petitioner did so. Thus, it is not clear that there were any meetings where Petitioner was without some form of translator. Likewise, Petitioner's statements during the colloquy regarding counsel's choice to not call Arriaza indicate that he and counsel were fully able to have lengthy and complex discussions outside of the court room. Petitioner told the trial court that he had discussed calling Arriaza at length with counsel, that he understood why Arriaza was not being called, and that he agreed with that decision. When the court allowed him time to ask questions or seek more information, Arriaza stated that he understood everything and had no questions. At

17

no time did Petitioner assert that he could not understand counsel, or that he had any difficulty understanding counsel at their meetings, especially in light of the fact that Petitioner was able to bring friends and family to those meetings to act as a translator where necessary. Thus, it does not appear that counsel was deficient, nor does it appear that Petitioner has shown, rather than simply asserted, that he was prejudiced by counsel's "failure" to provide a formal interpreter at all out of court meetings, both of which would be fatal to Petitioner's ineffective assistance of counsel claim. *Palmer*, 592 F.3d at 395; *Cross*, 308 F.3d at 315.

In any event, Petitioner has failed to provide any caselaw in support of his assertions, and this Court is aware of no Supreme Court holding which requires a formal interpreter at all extra judicial meetings between a lawyer and his client. As such, Petitioner has failed to show that the denial of this claim by the State courts amounted to an unreasonable application of law. Given that Petitioner has provided no more than vague assertions as to prejudice and the facts suggest that Petitioner understood his case, this Court likewise finds that the State courts did not rely on an unreasonable interpretation of the facts at hand. Petitioner's claim is therefore without merit, and he is not entitled to habeas relief.

### III. CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. §2253(c), a petitioner may not appeal from a final order in a habeas proceeding where that petitioner's detention arises out of his state court conviction unless he has "made a substantial showing of the denial of a constitutional right." "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude that the issues presented here are adequate

to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). For the reasons expressed above, Petitioner has failed to make a substantial showing that he was denied a constitutional right as jurists of reason could not disagree that Petitioner's claims are without merit and he has not shown that the issues presented deserve encouragement to proceed further. This Court shall therefore deny Petitioner a certificate of appealability.

**IV. CONCLUSION**

For the reasons stated above, Petitioner's petition for a writ of habeas corpus is DENIED, and Petitioner is DENIED a certificate of appealability. An appropriate order follows.

February 22, 2016                          *s/ Susan D. Wigenton*
                                                                                      Hon. Susan D. Wigenton,
                                                                                      United States District Judge